We have one case on our docket this morning, and we've allotted 15 minutes per side. We understand that there's some significant issues, and there might be some questions from the panels, so we will be flexible with the time. But we ask the epaulette to reserve some time, too, for rebuttal. And so I think we're ready to begin. Case number 12-3402, Villagersen v. Village of Hoffman Estates. May it please the court, counsel, my name is Thomas Dood. I represent the plaintiffs in this case. I would like to reserve three minutes for rebuttal in my oral argument. This case, essentially, boils down to whether a 28-year firefighter for the Village of Hoffman Estates, who fought nearly 1,000 fires throughout the country, was able to get away with the crime. He lost his career and over time suffered a loss of hearing, and the record is clear that the only, only cause of his hearing loss was the noise at work. And a career-ending injury, June 22, 2004, should have had his health insurance benefits paid by the Village of Hoffman Estates. Unfortunately, there are a number of procedural issues that are extremely important. The procedure, the quasi-judicial procedure is the most important, because this is the ordinance in Hoffman Estates since it was enacted. I do a lot of this work and I see this all over the state, word for word, the same ordinance, so it's important. I believe that, I had thought that this problem was solved by the Illinois Supreme Court in the Gaffney case. Gaffney agreed, involved a defendant that's a fire protection district. I agree that the court did not specifically address the home rule provisions of the Illinois Constitution, but the defendant in that case and the defendant amicai brief cited a plethora of state statutes under which the Illinois Supreme Court was not able to address the home rule provisions of the Illinois Constitution. My position in Gaffney all along was that Section 20 of the statute of the Public Safety Employee Benefits Act gave a legislative intent to occupy the field. The state was saying we do not wish to share concurrent jurisdiction with any other agency. And I quoted from Gaffney extensively, and I know that that's not favored, but on pages 17 and 18 of my brief, I went through the court's opinion from paragraph 30 through paragraph 46 of the Supreme Court's opinion. And the Supreme Court addressed my argument that Section 20 disclosed a legislative intent to occupy the field, and they concluded Gaffney's declaratory judgment count was the proper means of seeking a determination of Section 10 benefits. And then their words, in this case. So what the village is saying is they believe that they can use the home rule provisions of the Illinois Constitution as a method of distinguishing and cutting away a segment of public employers whereby they can impose a formal hearing procedure. I'm not saying that they don't have the right to have some procedure to determine whether they will or they won't pay. But what I'm saying is that the General Assembly has occupied the field, and whatever the village does cannot be entitled to the deferential treatment that a arm's length administrative procedure is given. Where this court would defer to factual findings, that this court would defer to the expertise of the agency. I do not believe those can. Okay. And maybe you can tell me what language are you relying on? Section 20. And what about Section 20 leads you to believe that the state has occupied the field so that a home rule unit cannot set up its procedures for deciding these claims? I actually laid it out on page 7 in my reply brief. It's my position that if you look at Section 20 in comparison with other statutes in which the courts have analyzed whether the General Assembly has occupied the field, I took a case cited by the defendants, City of Chicago v. Roman, and the Supreme Court. And in that case, by the way, the Supreme Court found that the particular statute did not withdraw the concurrent jurisdiction to hear the case. But what they did is they listed all of the statutes where the state, the General Assembly, has attempted to preempt exercise of home rule authority. And there's like 20 of them. Many of them the language is clearer than this. What I was looking for are what are the magic words or is there magic words that need to be invoked? And there were two in the litany. One was under the Citizens Utility Board Act. And I actually quoted it. You can compare Section 20 of the Public Safety Employee Benefits Act with Section 10-21 of the Citizens Utility Board Act. They're virtually identical except the sentences are transposed. And the language I rely on is this act is a limitation under subsection I of Section 6 of Article 7 of the Illinois Constitution on the concurrent exercise of powers and functions exercised by the state. And that's the same language that was utilized in the Citizens Utility Board. And that language in the Citizens Utility Board Act has actually been legislatively determined to completely preempt the field. The other statute I cited isn't quite that clear. There's a conflict between two appellate court decisions. Counsel, but going to Section 20, aren't the magic words really whether or not the employer or the home rule unit may not act inconsistent with the requirements of the act? No. It's not? The same language is in the Citizens Utility Board Act. Okay. It says that the state, that the home rule unit can't take action inconsistent with the provisions of the statute. But the Citizens Utility Board Act includes additional language. It clearly says home rule preemption. And they use the words exclusive exercise. Those words aren't in this particular statute. Those specific words are not in this section. And they do cite subsection H. But I think with that exception that the two provisions are virtually identical. Okay. Thank you. The question then becomes, again, it's a matter of statutory interpretation as to if there's going to be a procedure, are there limits on what the procedure can be? And our argument is that the ordinance in question literally appoints my adversary as being the hearing officer and adjudicator of the dispute. The ordinance whereby the village manager has delegated the authority to make these determinations is part of his general village manager responsibilities for the village. He is my adversary. He is the one that we would make a demand for compliance with the statute. And my adversary has now become the trier of fact, the person who construes, applies law to the facts and makes the legal determination. Counsel, wasn't there a hearing conducted here where parties were allowed to present evidence, present witnesses, and make arguments both in opening and closing as well? Well, that's not my argument. I'm getting to my question, though. And you're saying that the village manager was advocate as well as hearing officer? Who represented the village in this proceeding? Mr. Gennaro. Okay. And where was Mr. Gennaro? Was he the advocate or was he sitting as the arbiter of this hearing? Well, he and the village manager, I mean, the village manager, he is the general counsel. You're not answering my question. Where was Mr. Gennaro? Was he both hearing officer as well as advocate? He asked questions. I think that the village manager, if you read the record, I'm not relying on specific factual parts of the record, but if you read the record, Mr. Norris routinely contributed his take on how the fire department is run. And he made comments. So I'm not asserting in my argument individual bias. I'm saying that a procedure whereby my client is going to be bound by a determination involving benefits that are substantial is going to be adjudicated by a person whose interests are adverse to his, it's a conflict of interest. I mean, obviously, I have an opportunity to argue before the three justices of this court, but if one of the justices were also serving as village manager for the village of Hawthorne Estates, it would raise questions. Obviously, there are canons of ethics that apply that don't necessarily apply to the village manager. I will indicate to the court, I did find cases where the courts have held that when your adversary is the judge, it is not fair and it's not impartial. It's also not subject to the three-tiered test advanced by the defendants in their brief. Those are older cases, but the cases indeed have been followed more recently. And I cited the more recent cases involving the pension code. So my argument is, and I've fought these hearing procedures quite frequently, if somehow under collective bargaining the issue raised by Section 20 were adjudicated before an arbitrator, you'd have a fair and impartial person who has no financial stake. The village manager serves at the will of the village. He is an at-will employee and he has, he's incentivized to deny the benefits. We're going to go, I'm going to end my argument by looking at the way that hearing officer Norris applied the evidence. Any negative inference that could be drawn was drawn, but I think as a matter of law, it's troubling the way in which this ordinance has been enacted to make the village manager the hearing officer for the benefits. And this is not like a traffic case or not like a liquor license case where, because frequently the mayor of the city technically is the hearing officer for liquor license approvals. This is a case where the money at stake is village money. It's not a license. It's their treasury. And to have them be the ones who make a determination that will then be deferred to by the courts, I think is, I do think that the case is cited. But in those instances, aren't they also dealing with people's rights and interests as well? Whether it's a liquor commission, whether it's an expulsion hearing, whether it's a traffic matter. I mean, isn't the individual's rights and interests being affected by the hearing officer, such as in here, in this case? It's not that the rights, yes, the answer to the question is yes, but that's not the focus. You're talking about the money. Yeah, I'm talking about the city of Chicago has no direct financial interest in whether someone gets a liquor license. The city of Chicago or the village of Hoffman Estates has a direct interest in whether they're going to pay health insurance premiums or not. And to let the village manager be the trier of fact and the interpreter of the law, not in my opinion, I think it violates the fundamental due process of law. Does the statute address this at all? No. Statute aside. So if the legislature didn't want the home rule unit being the arbiter, they would have indicated some language in there either explicitly or implicitly? The General Assembly, this, I don't know where this case is headed, but there have already been three Supreme Court cases interpreting 820 ILCS 320-1 at second. It can't take up more than a page and a half. So my perception was, and I was involved in the legislation, the General Assembly passed it with the, and their perception was if a firefighter or a police officer ended their career responding to an emergency or during a criminal investigation, everybody would want to pay their health insurance. I don't think anyone contemplated the level of opposition that this statute has received since its passage in 1997. Now, the issue I'm going to argue is a legal issue dealing with collateral estoppel, but I do think it is worth noting that if you compare an independent agency's analysis of the same facts with hearing officer Norris's analysis of the facts, you get a completely opposite determination. And incidentally, the medical evidence presented to village manager Norris is the same medical evidence that was, it's the same stuff. It was the same record. I think that the precedent is clear with Richter and with Mabee, that there is an identity of issues here. There is privity between the parties, and we have two final adjudications. And I don't think that village manager Norris had the discretion to rule contrary on the issues that he ruled on. Okay? Did you present the issue of collateral estoppel? I did. To Mr. Norris. I did. It's on page, I think it's 522 of the record. When I come up for rebuttal, I have it written in my notes. I can get it for the court. Because hearing officer Norris asked me what my theory of the case was, and I said two things. I said, firstly, I think that over the years of his service, he had a progressive loss of hearing due to noise exposure, but he had this straw that broke the camel's back, so that the causation issue was twofold. And I said, and the decision of the pension fund is binding. It's collateral estoppel for making an adverse determination. I can give you the page number where that's. But Mr. Norris's findings don't specifically address collateral estoppel. I can't help that. My reading of it is correct. My focus with village manager Norris was that he shouldn't be there at all. Okay. But you did present. And it was the decision of the pension fund was an exhibit presented, I think it's Petitioner Exhibit 3. Right. Okay. The argument of the defendants is that there's no identity of issues because the question is was he responding to an emergency. But on the issues of causation, the issues are identical. Okay. And the Richter case, the court in Richter versus the village of Oak Brook was adamant that it is not required that a firefighter prove that all of his disability was caused by activities that were the result of responding to an emergency. He only needs to show that there was an event that was a contributing factor to his underlying disability. And in the Richter case, firefighter Richter had had a number of injuries to either of his shoulders. Some of them were during training exercises. Some of them were doing routine maintenance. And only one of them had to do with his actual responding to an emergency. And he went through a full-blown hearing before a judge in the Circuit Court of DuPage County, and a judge made an adverse factual and legal finding against the plaintiff that the appellate court reversed on the basis that the pension fund's determination of causation collaterally is stopped. Not the pension fund. I apologize. The Workers' Compensation Commission and the lump sum settlement agreement has stopped the hearing officer from making a conflicting finding. And the medical evidence in this case was the same medical evidence. The pension board made opposite findings. Which brings us to the final question. Is there any evidentiary basis for hearing officer Norris's decision? Even if you apply the manifest way to the evidence standard to the facts. So what's left with collateral estoppel? Should we accept your position that collateral estoppel applies? Is there anything left for Mr. Norris to decide? No. He has to confer the benefits, and the only issue is determination of the amount of reimbursement for the health insurance premiums that the Petersons have been paying since 2007. But the pension board, although they used some similar language, the pension board didn't have to decide whether or not the June incident involved an emergency. Is that correct? They did decide that. I think they did have to decide that. Because the pension code requires, in order to get a line of duty disability, the pension code has to find that the disability was the result of an act of duty. And that the act of duty caused the ultimate disability. And the act of duty that the board found was the straw that broke the camel's back was June 22, 2004. So that was a necessary factual finding. Well, can't the act of duty not be an emergency? An act of duty can be a non-emergency event. That's true. I agree. But that's not, in this case, that wasn't the fact presented to the pension board in this case. But there are acts of duty that are not emergencies. Counsel, I have a question in regards to the pension board's decision. That took place in 2007. It did. Prior to the Supreme Court's decision in Gaffney. Should we take that into consideration? The fact that when the pension board determined what an emergency was, and that question was still somewhat unclear until the Supreme Court in Gaffney defined what emergency was in this type of scenario? With all respect to the Court, I think the doctrine of collateral estoppel isn't hinging on what the Supreme Court's interpretation  It applies or it doesn't. I would call your attention, Your Honor, to page 507 of the record, in which the then village attorney for the village of Hoffman Estates wrote a very pregnant letter that I may intervene in the case. I don't know if we really want to. I think this is strictly going to be cumulative effects of acts of duty. We may not intervene. So the village could have intervened, and they considered intervening. It's in the record, page 507. Okay. But even if they, and I must admit, they didn't intervene, therefore they weren't formally a party, but they are in privity. And I cited the court to the Garcia case, and I know it's not precedent. Federal cases aren't precedent. But the state cases cited by the Garcia court are precedent and would apply to this body. Which brings us down to the issues that lay people are interested in, and that is, in fact, was Alan Petterson's disability, his hearing loss disability, the result of responding to an emergency? And here we have all of these issues. Okay. The hearing officer determined that the first question is, does the plaintiff have to prove that the June 22, 2004, episode was the primary cause of his disability to get health insurance? Okay. The second thing is, do they have to prove that there was a change in his physical condition from that, and do they have to prove that when you're on Interstate 90 with your lights operational, even though the fire has been extinguished, is there still an emergency? I don't think you need to do any of those things. Even if I concede, which I do not, if I concede that the June 22, 2004 episode never happened, this plaintiff would be entitled to have his health insurance premiums paid. Under Barr, under Richter, and under all of the decisions of the Workers' Compensation Commission, Quaker Oats, Peoria Bellwood Nursing Home, there is nothing that says that repeated insults to this man's hearing as a result of his responding to actual emergencies are not compensable, are not paid under the Public Safety Employee Benefits Act. There is nothing in the statute that would suggest that. There are no cases that I've ever seen in the workers' compensation field and the pension field that impose such a limitation. And beginning, I actually, preparing for oral argument, all of the medical evidence starts at page 392 in the record, and it goes through until page 506, just before the letter from Robert Williams. And every single doctor who rendered an opinion about this man's hearing indicated that he had a noise-induced hearing loss, and the noise-induced hearing loss was the result of his performance of activities as a firefighter. But we, and there's no finding of the pension board regarding that, that those. Because the pension board found that the June 22, 2004 episode. Okay. So they didn't feel it necessary. You are asking this court to look at the evidence of the prior incidents during emergencies, as you say, led to the eventual loss of hearing. In a sense. I'm asking this court. Because nobody's found the emergencies in the prior history. Okay. You only get to this argument if you find that the home rule authority gives them the right to have a hearing. If you find that the decision of village manager Norris is not bound by the doctrine of collateral estoppel, and you then have to look at his decision under the manifest way to the evidence standard. It's only then that you have to look at these prior acts. And because if we're going to say this is an administrative procedure, the decision and interpretation of village manager Norris are not non-reviewable. This court has the right to see if there's evidentiary support for his determinations. And my argument to the court is if you reach this point, I don't want you to reach this point, but if you decide he has the right to have a hearing, it's not bound by collateral estoppel, the June 22nd, 2004 episode didn't advance his disability, then this court still has to look at over 28 years whether he lost his hearing as a result of responding to an emergency. And you don't have to find that every... But there's no evidence in this record regarding those prior incidents. There's just... Absolutely. That they were emergencies? Each and every one of them. Not every one of them, no. 70% of them. Fire Chief Gourette testified 70% of his exposure to noise was responding to emergencies. That's in Fire Chief Gourette's testimony. So it's a broad sweeping conclusion, but we don't have any of the facts regarding anything other than the June 2004 incident. Your Honor, with all due respect, I don't... I've never viewed that I have a burden. If I have a witness testify that I fight so many fires per year and on these fires I do these duties and I'm exposed to hearing, I don't think I need to bring in the report for every single fire that that firefighter fought during a 28-year period. Doesn't the record contain medical evidence that one doctor found that there was no hearing loss whereas another one did? No. Everyone found a hearing loss and they all found that it was related. The only issue was the two doctors who did examinations after the 2004 episode were a Dr. Marzo, a Dr. Bartista, and a Dr. Golden. I'm sorry, there were three. Dr. Golden said that he had an apparent shift of his hearing, which he found to be minimal, but he agreed that there was a shift in his hearing. And that's on page 427 of the record. Dr. Marzo on page 438 of the record found a 15 decibel loss of hearing after June 22, 2004 as compared to the audiograms in 2003. Dr. Bartista on page 445 of the record, between 443 and 445 of the record, found a 15 decibel shift in hearing after June 22, 2004 as compared to the audiogram in 2003. So as I say, the Pension Board found that that episode was significant. But I just don't think that the burden of proof is to bring in a stack of NIFRS, the National Fire Reporting Service reports, to demonstrate the fire was caused. Well, what did the court in Gaffney do? The court in Gaffney examined the specific facts of each of the officers' claim into determining whether or not the injury stemmed from an emergency. And so for us to conclude that all of these prior things were truly responding to an emergency, I would think that we would need some factual basis. Well, the plaintiff testified to that effect. He testified to the sirens, where they were positioned, how often he fought them, where he stood at the fire scene. He was the engineer. I mean, his testimony goes on for 15 pages. He doesn't say on May 1, 2002, I was at a fire at Woodfield Mall. But he does testify that he was the engineer on the rig and that the rig had a siren mounted above him and in front and it caused a ring in his ears, that he operated the pump panel, that the motor used to drive the vehicle is the same motor that drove the pump, and that in order to get proper pressure, you had to use RPMs that generated a tremendous amount of noise. He wouldn't be doing it. I mean, yeah, theoretically, he could do that at a training exercise. But most of his exposure operating the pump was operating the pump to extinguish fires. I mean, the pension board found that he goes on 1,000 calls a year. Okay. I know we've gone over, counsel, so. Anyway, thank you for your time. All right, thank you. May it please the court and counsel, my name is Hal Morris. I'm here with Arthur Gennura, as well as the other individuals on the brief, Jennifer Crotchlow and Elizabeth Thompson. In addition, counsel for the amicus, the Illinois Municipal League, Brian Day is in court. I represent the village of Hoffman Estates in James Norris. I think perhaps the best place to start is the question of the collateral estoppel, which was pointed out. Counsel talked about federal case not being precedent looking at other precedential cases. So I think what we need to do here is look at the precedent with this court. The fourth division of the first district in escroba, specifically addressed in the context of placebo, whether a finding made by a pension board is collateral estoppel. And in that court case, they specifically said, we conclude that collateral estoppel did not bar the village from denying plaintiff's claim for benefits under the Employee Benefits Act. I believe it is clear that is the precedent. In addition, which is important, counsel cites or perhaps indicts Mr. Norris as a particular finder of fact. In the escroba case, as a matter of fact, Mr. Norris was also the finder of fact. This court has already looked at that and found that his contrary decisions are not collateral estoppel. So I would submit to the court that counsel's argument, there is precedent from this court. If you look at collateral estoppel itself, it makes it even clearer why that precedent is correct and appropriate. In the elements of collateral estoppel, there first has to be an identity of issues. As the court pointed out, an issue to be decided by the pension board is not whether there is a response to an emergency. That is an issue to be decided in a placebo. If they make such a determination, it is simply gratuitous. In addition, there must be an identity of parties. Counsel indicated that the village was not a party to the pension board hearing. So what counsel seeks to do and what plaintiff seeks to do here is hold the village, effectively hostage, to a gratuitous finding made by a pension board where the village was not even in fact a party. As a result of that, I submit to the court that collateral estoppel is not an appropriate concept to apply here. Can you address counsel's argument that the village actually wasn't privy with regards to the hearing before the pension board? It's not a party to it. So counsel's comments that they may have sought to intervene or perhaps even could have intervened, that is an undetermined fact. There was no intervention, no denial, no grant of intervention. Because collateral estoppel very specifically looks at, is it the same issue? Is it the same parties? Is there the same incentive to defend? Different issue, different parties. The village isn't there. I submit it doesn't really matter. It cannot apply. Which perhaps brings us full circle to the specific procedure that the village utilized. The procedure the village utilized was an administrative hearing process. The administrative hearing process here is far different in analysis than that which we found in Gaffney. In Gaffney, we were dealing with the fire protection district. It goes almost without saying that a home rule entity is far different under Illinois law from a non-home rule entity. Springing from the constitutional grant of power in Article 7, Section 6A, the home rule gets its powers essentially as the sovereign does the state. In Section 7 of Article 6, it specifically says that non-home rule must get it from law. Hence, the Gaffney decision is extremely understandable. That court went to great pains to scour the specific enabling statute, the Fire Protection District Act, to make a determination whether the fire protection district had the power to do what it did. Finding none, the court concluded you cannot hold the hearing. That is not the analysis we have here. The analysis we have here is we start with home rule. Home rule is a broadly conferred, a broadly described power and can only be usurped with specific taking away by the legislature. We find that both constitutionally, as well as in the statute on statutes, as well as in case law. And that's what we don't have here. As the court pointed out, and as counsel admitted even at the hearing this morning, the PSEBA statute is silent in terms of any type of procedure. Our Supreme Court noted that silence when the trial court heard the question of can there be effectively home rule preemption. It looked, as I believe the law requires us to look, does the statute address it? And I would submit to the court the statute does not. If the statute is silent, there can be no inconsistency between what the village did under its home rule powers and what the statute provides. Very specifically, Section 20, which is where plaintiff looks to find home rule preemption, is very specific language, far different than what was cited in the brief. That language focuses on in a manner inconsistent with the requirements of this act. There can be no inconsistency, as the court recognized, if it is silent. Moreover, if we look at the specific provision in plaintiff's brief under the Commerce Commission, that talked about exclusivity and it talked about where that act specifically has provisions. There are no such provisions here. As a result of that, what the village did was an appropriate exercise of its home rule authority. In terms of village manager Norris acting as the hearing officer, I would first observe to the court that if someone who has some, as plaintiff puts in their words, interest in perhaps an outcome, cannot serve as a hearing officer, and that would be this court's ruling, IDOT can no longer have hearings. You can't have hearings under labor contracts to our management or to our labor, because they would have an interest. That is not our test. The test is, if he wants to look at constitutionality, is there a rational basis? And there is a rational basis. And very tellingly, what counsel said, he didn't believe that it was his burden to demonstrate or look at specific, I think the terms are individual actions by Mr. Norris. And that's precisely what this court must look at. Was there actual prejudice? Was Mr. Norris, in a way, acting contrary to being a fact finder? And I would submit to the court the record is absolutely silent that there is any such problem in this. As a result, the adjudications made by Mr. Norris at the administrative hearing pursuant to the home rule powers should be and are only reviewed by this court under a manifest weight of the evidence or clearly erroneous when we look at any sort of mixed question of law and fact, which really turns us to what was the evidence below. But where we must start with the evidence below is who had the burden? The burden at the administrative hearing was on the plaintiff. Our Supreme Court in NOAC specifically addressed this issue. Counsel suggests that Mr. Norris may have made adverse inferences. Courts do that all the time. The difference here is under the NOAC case, specifically our Supreme Court has made clear that the statute 10A, which is the placebo statute, is liberally and in favor of the intended beneficiary construed. That's what plaintiff wanted. However, the court concluded, that is the very opposite, quote, of what our canons of construction compel. So this particular statute, the way it is to be interpreted by NOAC and the Supreme Court jurisprudence is it's not in favor of benefits. It's really not in favor of it. But most importantly, when we look at the actual evidence at the administrative hearing, it is very clear that at best there may be some sort of conflicting testimony, but even that conflicting testimony, when we look at it closer, is telling what it says. There's no question, as counsel points out, that stops here, that each of the physicians who examined Mr. Pedersen made a determination that there was a noise-induced hearing loss. But what they didn't go is go the one step further. There is no evidence in this record that that noise-induced hearing loss was in response to what is an emergency. And if we look at the definition of emergency that we find in Gaffney,  requiring urgent response, that was the plaintiff, there the applicant's burden to demonstrate that those noise-induced losses came from that. Moreover, when we look at the actual specifics of the physicians, what is most telling if we look at Dr. Golden's, Dr. Golden makes a clear conclusion is that when compared using the date of baseline hearing and then going six months later, he finds there to be no hearing loss and his loss of hearing that was existent returned to the baseline, which demonstrates that there is a record here that was established that if this is the so-called straw that broke the camel's back, the camel's back wasn't broken by the June incident. Rather, at best we have a substantial amount of evidence that Mr. Pedersen had a hearing loss. Fair enough. What we don't have is that it was occasioned by and as a result of his response to an emergency. That was the burden of the plaintiff or the applicant. It wasn't reached. Why wasn't it reached? If we look at the record below, we can determine why it wasn't reached. In large measure, what Mr. Pedersen really said is that, and he signed off on specifically the supervisor's accident report, which is part of the record, that it was after the call. He said he wasn't responding, he was on a call. Putting aside niceties of language and the like, as the court I think recognizes, not everything you do, even if you're entitled to a disability pension or some other type of pension, says it's as a result of an emergency. And it was the requirement of the plaintiff not to testify before this court that that's what I think all the evidence meant, but to demonstrate that. And specifically when we look at the evidence that was made clear through the physician reports, that evidence is lacking. As a result of that, we look at the specific findings that Mr. Norris made, and his findings are very telling for the purposes of this court. His findings made on May 27th of 2008, in paragraphs 4, 5, and 6 of those, specifically talk of the medical evidence, the record indicating, based on the evidence, the medical evidence. Those are factual determinations. And the question there is, are those factual determinations against the manifest weight of the evidence? I submit to the court, no. Just because if we would have decided it, we might have looked at it differently, or we could have, is of no moment. The question is, is it against the manifest weight? And the answer I would submit is no, because of what we have in front of us. We really have an admission that the plaintiff thought, I didn't need to prove anything, therefore I didn't. And because he didn't, we're with this record. Does that end the inquiry? It does not, because then we need to apply those factual findings to the requirements of the CEBA. When we look at the requirements of the CEBA, there are the two requirements. The catastrophic injury, which is defined to be effectively an injury that could lead to a line-of-duty disability, defined to be, and then as a result of an emergency, or responding to an emergency. That would be a mixed question of law and fact. That's clearly erroneous, would be the standard of review. I would submit, just as the trial court found, it was not clearly erroneous on this record to make that finding. So should this court. When we take this, I think, in its context, where it sits. Our legislature has passed a particular statute, the CEBA, saying you cannot do certain things inconsistent with the act, but being recognized by the Illinois Supreme Court that there is nothing in the act suggesting a hearing procedure. Because of that, nothing the village did here in holding a hearing and having a procedure can be inconsistent, and there can be no home rule preemption there. By having Mr. Norris serve as the hearing officer, he was not the lawyer. Mr. Gennaro was the lawyer. Hearing officers, of course, can ask questions, and hearing officers are typically employees of or retained by the agency which they do their hearings for. That's what Mr. Norris did. There was nothing pointed to that Mr. Norris did contrary to what our Supreme Court determined in NOAC to be the standards we apply. As a consequence, when we look at that and we take it with this court's jurisprudence under escroba and also the Barr decision, there can be no collateral estoppel effect, so the burden remained with the plaintiff. And on this record, the factual determinations that were made are such that they are not against the manifest way of the evidence, and then the determination of how those facts affect whether you get placebo eligibility or not are certainly not clearly erroneous. As a consequence of that, we would urge this court to affirm the trial court as well as affirm the decision of the Village of Hawthorne Estates with respect to the denial of these placebo benefits. Counsel, I have a couple of questions. With regards to NOAC, wasn't one of the issues that was determined in that case was the fact whether or not there should have been retroactive benefits allowed? In part, that's correct, yes. But what it goes to, it goes to how do we determine what is the intention or the interpretation of that statute, placebo, and in making that determination our Supreme Court has said how we construe it, whether it's about Section 1 or Section 2 or Section 10, we're construing it in such a way that it is not necessarily in favor of the person seeking the benefits as the plaintiff sought. They also sought the same argument in Gaffney and the Supreme Court in addition to rejecting it there. All right. And the plaintiffs here also rely on skilling. I believe employers mutual versus skilling with regards to the issue of villages not being permitted to conduct administrative hearings or set up administrative procedures. Could you address that? If we look at specifically the question of what are villages allowed to do, and really we have to say what are villages that are subject to Home Rule authority allowed to do. There's a very distinct difference there that those that are not subject to Home Rule, we look purely to their enabling statute, either Municipal Code or in the case of the Fire Protection District, a Fire Protection Code. Here, what a village under Home Rule is permitted to do is to specifically maintain and have rules within effectively what would be their core governmental function. That core governmental function, of course, includes police, fire, et cetera. And the case law from this Court and the Supreme Court makes very clear that they can have, I think, in effect, administrative hearings. Can they if the legislature says no? The answer is, of course, no if it's a specifically addressed issue. Why do I say it that way? Because if it is going to be specifically taken from that right that you speak of from the village under the Notes to Home Rule Act, there must be a specific note saying we're taking it away and here is, in fact, the particular impact. That is missing here. The reason that's missing is that was not a right that was taken away from this village. If you look specifically or more specifically at what villages really do, I think the Del Rivio case from this Court specifically said that personnel boards can exist. So there is a power to have administrative procedures and administrative decision-making. In a case which I'm going to not be able to pronounce, the Treta Nero by Gattaclose v. Aurora case from the 2nd District, the Court found the same way that you could even deny a hearing to someone. So to say that they can't have a hearing, I think, doesn't go the next step, which is why are you saying that? If you're saying it because you're subject to a particular code that gives you very limited powers, such as the Fire Protection District Act, the answer may be yes. If you're looking at it under the constitutional powers provided to Home Rule, I think the answer is more likely no without a specific preemption. Is it your position that the collateral estoppel does not apply at all? Or is there some room for a determination that what was left for Mr. Norris to decide was whether or not the June incident was an emergency? I don't believe it applies at all. And the reason I don't believe it applies at all, if we go back to the Supreme Court's jurisprudence in the Crowey case, that case specifically holds not that there's collateral estoppel, but because PSEBA does not give a definition of what a catastrophic injury, we will define it to be the same as it is under the pension code. It's simply a definition. As a result of that, I would submit to the court there's no collateral estoppel. As a, if you will, an overlay to that, if you look at other individuals that could be subject to PSEBA, for instance, correctional officers, perhaps people in a fire district or in a fire department with a village of less than 5,000, they would not be under the pension code. So if you needed that pension code to be res judicata or collateral estoppel, it couldn't even be present there. And that's why I think the courts have expressed a very clear indication that we may look to the definition, but that does not then collaterally estop that decision from being made later. And, in fact, that's what this court in Escobar specifically found, is that there is no collateral estoppel effect. And, in fact, it is up to now the determination of PSEBA. But are we doing also an issue of causality? And in the maybe, I think it is called, versus village of Schaumburg, that issue was determined and the court felt that there was collateral estoppel there. Maybe as a workers' compensation case. In workers' compensation, there is an identity of parties. There is no identity of parties here. In addition, because it's utilizing the same definition there, though not in a PSEBA context, it was a decision that needed to necessarily be made. Here, even if we jump over the requirement of identity of parties, which I submit we should not and cannot, and we look at just the issue, unlike in maybe, this or any pension board does not need to find, as the court pointed out, the response to an emergency or catastrophic injury. It simply needs to find a line-of-duty disability, a disability injury, effectively in the line of duty. That is different than what PSEBA. In PSEBA, you need to make that proof here. So I would submit that maybe is not controlling here. It's a different situation. And when we look at the law of collateral estoppel, we can see how it could fit into it in that context, but not in this context. What really is being urged on this court, if in fact there can be collateral estoppel, is gratuitous findings, such as the finding of emergency, such as the finding of catastrophic injury, which is not under the pension code, it's under PSEBA, would simply bind people in another process. And this court, I would believe, and the Supreme Court's jurisprudence does not permit that to occur. It wasn't something that had to be determined, as it was in maybe. It wasn't something that was before them, as it was in maybe. And it's different parties, which is different than maybe. So I would submit collateral estoppel doesn't apply, and maybe doesn't, if that's the pronunciation, apply to this case. But didn't the pension board make the determination as to what an emergency was and whether or not there was a catastrophic injury? It made that determination. But as I suggest, that determination, as our court has held, Supreme Court, is not required for a pension. You can get a pension if you have a line of duty, if you have a duty disability. It does not require that it be in response to an emergency. There are other cases. A scrove is a good example of that. They didn't find an emergency, but instead, in a scrove, he was working in the fire station. He wasn't responding. He was simply in the station. So it's a very different analysis, I think, and I would submit to the court that collateral estoppel cannot and should not apply because they're different issues, different parties, different incentives, and also, most importantly, what the court looked at, I would submit, in a scrove and in others. When the pension board makes a decision, is it a decision that really is before it and needs to make? You can think of the most unusual examples. What if it found that a third party was negligent? Would that mean the third party couldn't argue I wasn't negligent in another lawsuit? Of course not. And that's equivalent when we have them. The village isn't there. They're a third party. So as a consequence, what we would ask this court to do, as we did below, is to affirm the circuit court's decision, which affirmed the decision of the hearing officer of the village of Hoffman Estates with respect to this request for eligibility for placebo benefits. Thank you. Thank you. May I please have the court briefly in rebuttal? As promised, on page 387 of the record, C387, hearing officer Norris said, Mr. Duda, what I'm trying to do by listening to all this is what you're contending on behalf of your client. My response was the argument that we both have a straw that broke a camel's back, plus accumulative effects of prior injuries. But on page 388, quote, no, I simply wanted Mr. Pedersen to explain why he feels he is entitled to benefits, in my opinion, legally, exhibit for his collateral estoppel, meaning as a matter of law, regardless of the evidence, regardless of anything, the village has to pay because the pension fund found that this man is disabled as a result of exposure to loud noise at work. So I did raise the issue of collateral estoppel. Number two, in terms of the burden of proof on the pre-2004 disability, the court asked me a question. I didn't answer it. Gaffney was a musculoskeletal injury. It was a one-shot deal. He hurt his shoulder. The nature of his injury was a single event. Hearing loss in people exposed to loud noise is an ongoing progression. And at pages 329 through 342, I set all of the necessary foundation and the medical opinions of the doctors, and I indicated to the court that those start at page 423, and you really should read all of it because there are like eight opinions, and they're unanimous, that these duties that I had made the foundation contributed to his hearing loss. A scrova has nothing to do with this case. A scrova is not a raised judicata collateral estoppel case. A scrova was strictly a firefighter who was in the station. He wasn't on a call, and that was the basis of the court's determination. To give the spin on a scrova that the defendants are trying to give would indicate that it's in conflict with Mabee and Barr and Richter, and Richter versus Village of Oak Brook I think is even the most impressive case. A scrova attempted to argue collateral estoppel, but the court was unimpressed because he wasn't on a call at all. And finally, in terms of whether there was an emergency, Mr. Petterson testified that the fire was over, but he said, I was in the midst of an emergency, lights were going, he's on an interstate highway, under circumstances that the General Assembly has passed special legislation that motorists, when they see a vehicle in the condition of the fire engine in the condition of Mr. Petterson, have special penalties applicable to them if they don't respect it because of the inherent dangers of what Mr. Petterson was doing on June 22, 2004. Finally, I totally disagree with counsel's interpretation of the medical opinions on returning to baseline. I don't think that's what Dr. Golden said, and it's certainly not what Dr. Batista and Dr. Marzo said. Batista and Marzo said there was a permanent 15 decibel shift. That's empirical. It's documentable. And anyone who finds that it's not is making a decision that's against the manifest weight of the evidence. I appreciate the Court's attention very much. Thank you. We will take the case under advisement. Thank you.